IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL A. PENNINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-0234-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael Pennington seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding plaintiff's subjective allegations of disabling symptoms not credible, (2) failing to incorporate mental limitations in the residual functional capacity, (3) finding that plaintiff had past relevant work as a retail sales clerk, and (4) failing to incorporate all of plaintiff's impairments in the hypothetical. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On August 19, 2010, plaintiff applied for disability benefits alleging that he had been disabled since March 17, 2005. Plaintiff's disability stems from a rotator cuff injury, hip injury, chronic pain, hypertension, restless leg syndrome, chronic constipation, sleep apnea, and depression. Plaintiff's application was denied on December 2, 2010. On January 10, 2012, a hearing was held before an Administrative Law Judge. On February 8, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On February 6, 2013,

the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, medical expert Dr. Steven Gerber, and vocational expert Kelly Winn-Boaitey, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1975 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1975 | $ 1,020.31 | 1994 | $ 19,100.88 |
| 1976 | 745.34 | 1995 | 21,351.78 |
| 1977 | 2,525.87 | 1996 | 25,158.45 |
| 1978 | 3,096.76 | 1997 | 14,949.76 |
| 1979 | 5,687.72 | 1998 | 2,553.45 |
| 1980 | 9,983.83 | 1999 | 8,336.71 |
| 1981 | 12,886.18 | 2000 | 24,268.77 |
| 1982 | 7,957.90 | 2001 | 36,650.79 |
| 1983 | 7,947.00 | 2002 | 39,244.84 |
| 1984 | 17,511.26 | 2003 | 37,816.81 |
| 1985 | 19,076.62 | 2004 | 27,238.82 |
| 1986 | 19,748.27 | 2005 | 1,624.46 |
| 1987 | 20,654.45 | 2006 | 1,882.50 |
| 1988 | 20,980.00 | 2007 | 340.05 |
| 1989 | 10,023.99 | 2008 | 0.00 |
| 1990 | 18,340.00 | 2009 | 0.00 |

| 1991 | 20,007.11 | 2010 | 0.00 |
| 1992 | 19,737.44 | 2011 | 0.00 |
| 1993 | 22,064.16 | | |

(Tr. at 115-116, 118).

## Function Report

In a Function Report dated October 20, 2010, plaintiff reported that he lives in a house with his companion (Tr. at 127-134). He described his day as follows:

> Get dressed or take a hot bath to help loosen myself up. Sit on my deck with our cats, do laundry, feed the cats, clean litter box, do any shopping for food, and/or personal items, read for a while, watch some TV, visit with my roomate [sic] when she gets home from work, fix my dinner, watch some more TV before bed.

Plaintiff can mow, but it takes him a half a day to do his yard and he has to take a lot of breaks. When plaintiff goes out, he drives a car and can go out alone. He shops in stores for food and clothing once or twice a week for 30 to 60 minutes at a time. He goes to Concerts at the Park in Blue Springs, Missouri, on a regular basis.

Plaintiff's condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks (Tr. at 132). His condition does not affect his ability to remember, to concentrate, to understand, to follow instructions, or to use his hands (Tr. at 132). He can pay attention for several hours.

## Your Missouri Courts Case Search

Plaintiff pled guilty to involuntary manslaughter - vehicular - intoxicated, a felony (Tr. at 159). The guilty plea was entered on September 19, 1998. He was sentenced to five years in prison, the execution of which was suspended, he served 120 days shock incarceration, and he was released on two years of probation.

**Stipulation of Compromise Settlement - Worker's Compensation**

Plaintiff's stipulation for compromise settlement is a part of the record and states that plaintiff's employer and insurer had paid $26,048 in medical expenses and $19,296.56 in temporary disability related to plaintiff's shoulder condition, and the worker's compensation settlement was for an additional lump sum of $18,481.41 (Tr. at 110). This document is dated May 10, 2006. Plaintiff also received a lump sum payment of $3,034.97 from the second injury fund (Tr. at 114). His total compensation for the shoulder condition aggravation was $47,564.38 (of which he testified his attorney got about $6,000) along with $26,048 in medical expenses.

**B.      SUMMARY OF MEDICAL RECORDS**

Plaintiff's alleged onset date is March 17, 2005, the date of his shoulder surgery.

On March 25, 2005, plaintiff saw Anne Rosenthal, M.D., at Rockhill Orthopaedics for a follow up on his right rotator cuff repair[1] on March 17, 2005 (Tr. at 227). Plaintiff said his arm felt good, he had minimal pain and no complaints. She noted that plaintiff was doing well and started him on a formal therapy program.

---

[1]The shoulder is made up of three bones: the upper arm bone (humerus), the shoulder blade (scapula), and the collarbone (clavicle). The shoulder is a ball-and-socket joint: The ball, or head, of the upper arm bone fits into a shallow socket in the shoulder blade. The arm is kept in the shoulder socket by the rotator cuff. The rotator cuff is a network of four muscles that come together as tendons to form a covering around the head of the humerus. The rotator cuff attaches the humerus to the shoulder blade and helps to lift and rotate the arm. There is a lubricating sac called a bursa between the rotator cuff and the bone on top of the shoulder (acromion). The bursa allows the rotator cuff tendons to glide freely when the arm is moved. When the rotator cuff tendons are injured or damaged, this bursa can also become inflamed and painful.



On March 28, 2005, plaintiff saw Dr. Rosenthal for suture removal (Tr. at 226). Plaintiff said his shoulder felt good, he had no complaints, and therapy was progressing well. She noted that plaintiff was doing well. She told him not to use his right hand or arm, not to operate machinery, and not to drive, and to come back for a follow up in four weeks.

On May 3, 2005, plaintiff saw Dr. Rosenthal for a follow up (Tr. at 224-225). Plaintiff had no complaints and said his arm felt much better since the surgery. She noted that plaintiff was making good progress with therapy. "The therapist understands he had a very large tear and I want to proceed slowly with strengthening." Plaintiff was noted to be doing well, was told not to use his right arm or hand at work, and to return in four weeks.

On May 31, 2005, plaintiff saw Dr. Rosenthal for a follow up (Tr. at 223). Plaintiff had no new complaints. "The shoulder feels much better. He feels he's doing very well." Plaintiff was told not to use his right hand or arm until June 9, 2005, and then he had a one-pound restriction.

Plaintiff was released to return to work on August 15, 2005 (Tr. at 196).

The following day, on August 16, 2005, plaintiff saw Gregory Boyd, D.O., due to arm pain (Tr. at 196). Plaintiff was performing a sit-down job but had been asked to "throw" casings up which required him to move his arms above his head. That caused pain in his right shoulder. Plaintiff also reported left hip pain due to prolonged sitting, and he reported insomnia, depression, and occasional discomfort and bulging in the left inguinal region. Plaintiff was noted to be anxious but "almost cheerful at times". Plaintiff was assessed with

right shoulder and right hip pain,[2] left inguinal hernia,[3] depression, insomnia, and elevated blood pressure. Plaintiff was prescribed Cymbalta, an antidepressant, and Ambien, a tranquilizer used to treat insomnia. "I did write a note basically saying that I am not able to complete his disability evaluation." Dr. Boyd referred plaintiff back to his orthopedic surgeon for that. It is unclear why plaintiff would ask his primary care physician to complete a disability evaluation the day after his orthopedic surgeon released him to return to work.

On September 6, 2005, plaintiff saw Dr. Rosenthal (Tr. at 219-220). Plaintiff said his shoulder was "no better at this time" although he did say it felt better than before surgery. "This is the first time I am hearing about this." Plaintiff told Dr. Rosenthal that he went back to work after she released him, but he was only able to work for six hours and then had to leave because of the pain. Plaintiff said he wanted to go back to work as a tool setter but his company would not allow him to do that. Dr. Rosenthal noted that plaintiff was nontender to palpation throughout the shoulder, and his rotator cuff strength was normal. "The job description that I have been given does not match what he describes that his current job entails. I released him to full duty work because he was able to perform the job that was described in the letter sent on 7/1/05. . . . I would not want him returning to a position where

_____

[2]Although the assessment was right hip pain, the notes reflect that plaintiff had complained of pain in his left hip and had had a hip replacement on the left. Dr. Boyd found tenderness with palpation of the left hip. Therefore, I assume the diagnosis should have been left hip pain, not right hip pain.

[3]"An inguinal hernia occurs when soft tissue -- usually part of the membrane lining the abdominal cavity (omentum) or part of the intestine -- protrudes through a weak point in the abdominal muscles. The resulting bulge can be painful, especially when you cough, bend over or lift a heavy object. An inguinal hernia isn't necessarily dangerous by itself. It doesn't get better or go away on its own, however, and it can lead to life-threatening complications. For this reason, your doctor is likely to recommend surgery to fix an inguinal hernia that's painful or becoming larger. Inguinal hernia repair is a common surgical procedure." http://www.mayoclinic.org/diseases-conditions/inguinal-hernia/basics/definition/con-2002 1456

he has to use his right arm at or above shoulder level continuously. . . . .  We have requested job description."  Dr. Rosenthal restricted plaintiff to work that does not involve use of the right arm at or above shoulder level constantly.

On October 10, 2005, plaintiff saw Sidney Devins, M.D., a pulmonary specialist, with complaints of insomnia, restless legs, and sleep apnea after having been referred by Dr. Boyd (Tr. at 217-218).  Plaintiff complained of feeling unrefreshed in the morning, being under a significant amount of mood swings and emotional distress, and as a result was unable to concentrate.  Plaintiff was on worker's compensation.  He continued to smoke and had been smoking for 25 years.  Plaintiff had a history of illicit drug use but said he had not used drugs in years.  Plaintiff was taking Cymbalta for depression and Ultracet for pain.  "He took Lunesta for the last 10 days and it helped him sleep tremendously."

On exam plaintiff's pulmonary functions were "fairly normal" and his oxygen saturation was 97% on room air, which is normal.  He was assessed with sleep apnea syndrome with restless legs.  Dr. Devins recommended an overnight sleep study to rule out obstructive sleep apnea[4] and to evaluate limb activity.  He gave plaintiff a prescription for Lunesta.

On October 19, 2005, plaintiff had a sleep study which showed mild obstructive sleep apnea with oxygen saturations well maintained (Tr. at 221).  Periodic limb movements were not frequent.  Quintin Cokingtin, M.D., encouraged plaintiff to sleep on his side as his respiratory events occurred much less commonly when he slept on his side.  He also

---

[4]"Obstructive sleep apnea is a potentially serious sleep disorder in which breathing repeatedly stops and starts during sleep.  Several types of sleep apnea exist, but the most common type is obstructive sleep apnea, which occurs when your throat muscles intermittently relax and block your airway during sleep. The most noticeable sign of obstructive sleep apnea is snoring."
http://www.mayoclinic.org/diseases-conditions/obstructive-sleep-apnea/basics/definition/con-20027941

recommended a CPAP.[5]

On October 31, 2005, plaintiff aw Dr. Boyd for a follow up on hip pain, hypertension, depression, insomnia and hyperlipidemia (Tr. at 195). "He is doing better currently." His depression and insomnia were noted to be improved. Plaintiff was given information on diet and exercise and was told to start fish oil capsules.

On January 6, 2006,[6] plaintiff was seen by Gregory Walker, M.D., a neurosurgeon, in connection with his Worker's Compensation claim (Tr. at 183-188). Plaintiff claimed that his job of scooping red slogs with a scoop on a repetitive basis to fill hoppers at Lake City Ammunition caused shoulder pain. Plaintiff had undergone surgery to repair a right rotator cuff tear and subsequent physical therapy. When plaintiff returned to work, he was unable to work more than six hours due to shoulder pain and had not gone back to work since. Plaintiff said he has shoulder discomfort when performing any work above 90 degrees.

Dr. Walker reviewed plaintiff's medical records and noted that on August 9, 2004, plaintiff had seen Dr. Hall about his right shoulder pain. "He performed some overhead activities and said that he had had those problems in his shoulders since a car accident back in the 90s, but his job occasionally aggravated it and he had not decided whether . . . he [was] going to make this [a] Workman's Compensation [claim]."

> Current Complaints: The patient states that he still has limited range of motion in the right shoulder with discomfort produced by abduction beyond 90 degrees or flexion beyond 90 degrees. He states he is unable to perform any work, which required

---

[5]Continuous positive airway pressure (CPAP) therapy is a common treatment for obstructive sleep apnea. It includes a small machine that supplies a constant and steady air pressure, a hose, and a mask or nose piece. A CPAP machine increases air pressure in the throat so that the airway does not collapse during breathing.

[6]Dr. Walker's letter to T. K. Thompson referenced plaintiff's appointment on January 6, **2005**, and his letter was dated January 10, **2006**. Because the letter refers to an occurrence on September 6, 2005, I conclude that the date of the appointment was actually January 6, 2006.

shoulder level or higher positioning of the arm. With regard to his left arm, which suffered a fracture in 97 . . . he states that he does well with this for the most part. . . .

Recently he saw Dr. Greg Hummel Independence an orthopedic surgeon and at that time the patient states he was riding a mountain bike. Dr. Hummel told him, he should avoid this at all cost, as this would have a detrimental effect on his total hip arthroplasty.

Plaintiff said he had also been diagnosed with an inguinal hernia, and he has sleep apnea and restless leg syndrome. He was a 20-year smoker. He graduated from high school and completed training to be a dental assistant in the late 80s. He worked at a studio making stained glass for 17 years but the studio went bankrupt.

Physical Examination: The patient is 6 feet in height and weighs approximately 175 pounds. He is awake, alert and oriented. His speech appears lucid and fluent. His affect is normal. . . . Range of motion of the cervical spine is full and unimpeded. Strength in the upper extremities appears normal in all muscles tested . . . . Range of motion testing of the right upper extremity reveals abduction to approximately 160 degrees, forward flexion to 160 degrees, extension, internal rotation, external rotation were all normal. Left shoulder range of motion is normal. Strength in the lower extremities appeared normal. . . . The patient was able to heel and toe walk. Reflexes were intact . . . . The patient's gait appeared normal and the pelvis appeared level.

Impression: . . . The patient has had an excellent surgical result but continues to have pain particularly with any work above shoulder level, which is uncommon. I feel that the patient has reached maximum medical improvement from this surgery and injury and would rate him currently at 30% permanent partial disability at the level of the shoulder. . . .

At this point in time, restrictions should include no work above shoulder level with the right arm, no lifting greater than 20 pounds with the right upper extremity, avoidance of climbing ladders or any activities requiring excessive rotation of the hip joints.

On January 26, 2006, plaintiff saw Dr. Boyd for a follow up on hypertension (Tr. at 193). Plaintiff's blood pressure had been 190/120 when he went in for pulmonary function testing. His blood pressure on this day was 144/112. EKG was normal. Plaintiff was given medication for hypertension.

On February 21, 2006, plaintiff saw Dr. Boyd for a follow up (Tr. at 192). Plaintiff had had lab work which showed elevated triglycerides (fat in the blood) and elevated total

cholesterol and LDL. His blood pressure was 160/100. Plaintiff told Dr. Boyd that Dr. Devins had given him some ReQuip for his restless leg syndrome which provided relief. Plaintiff was assessed with hypertension not under good control, high cholesterol not under good control, and impaired blood sugar metabolism. He was given samples of ReQuip along with a prescription, five weeks' worth of samples of Caduet (treats hypertension), and samples of Benicar (treats hypertension).

On April 26, 2006, plaintiff saw Dr. Boyd for a follow up (Tr. at 191). Dr. Boyd noted that plaintiff had not yet had a CT scan of his liver which had been recommended because of "a slight perhaps abnormality" on his echo of the liver. "He reports he is doing relatively well so far." Plaintiff stopped taking Cymbalta due to the cost but Dr. Boyd noted that it appeared not to have caused a problem. He had not followed up with pulmonary for a sleep study and was strongly encouraged to do so. Plaintiff's blood pressure was 128/84, his blood work was near normal, and Dr. Boyd noted that these were "markedly improved." He recommended diet and exercise, a pulmonary consult, and Benadryl at night for sleep. He prescribed Ultracet for pain, Caduet for hypertension, and Benicar for hypertension.

About 13 months later, on June 5, 2007, plaintiff saw Dr. Boyd for a follow up (Tr. at 190). "He has been out of his blood pressure medicines." Plaintiff's blood pressure was 205/130. He was given medication in the office and his blood pressure dropped to 154/88. He was asymptomatic. His exam was normal in all respects. He was assessed with "Hypertension, not under good control, secondary to nonuse of medication." He was given samples of Caduet and Benicar, both for hypertension.

A year later, on June 10, 2008, plaintiff saw Dr. Boyd for a follow up (Tr. at 189). Plaintiff reported he had been unable to get his lab tests done because he could not afford it. Plaintiff continued to take Tramadol for pain, Naprosyn (non-steroidal anti-inflammatory),

Benicar (for hypertension) and Caduet (for hypertension). Plaintiff's physical exam was normal. His blood pressure was 170/104. Dr. Boyd discontinued Caduet and Benicar and prescribed Lisinopril and Norvasc for hypertension and Pravachol for high cholesterol.

On July 16, 2008, plaintiff went to the emergency room at Truman Medical Center complaining of back pain (Tr. at 280-282). He saw David Dahl, M.D. Plaintiff said he had hurt his back when he slipped off a boat. Plaintiff's physical exam was normal except he had some tenderness over the lower lumbar spine. He had full range of motion but slow flexion. X-rays showed some early degenerative changes of the lumbar spine. He was assessed with back pain. Dr. Dahl prescribed Ultram (opioid), Indocin (non-steroidal anti-inflammatory) and Flexeril (muscle relaxer).

On September 25, 2008, plaintiff went to Truman Medical Center for a follow up on high blood pressure, inguinal hernia, obstructive sleep apnea, and depression (Tr. at 264-265). Plaintiff said he had had the hernia for the past three years. "Does not really cause any particular pain earlier in the past or at the time." He was not using a CPAP as had been recommended for sleep apnea because he said he could not afford one. Plaintiff continued to smoke. His blood pressure was 170/100. On exam Amy McGaha, M.D., noted an "easily reducible" inguinal hernia. He had normal strength in all extremities. His gait was normal. Mood and affect appeared somewhat anxious. Plaintiff was assessed with severe hypertension (his medication was increased), inguinal hernia (surgery was recommended), history of obstructive sleep apnea and depression. "[U]se CPAP as needed. This may be the source for many of his underlying problems including his hypertension, depression, restless legs, daytime somnolence problems." He was given a prescription for Celexa (antidepressant).

On October 23, 2008, plaintiff saw Lynn Happel, M.D., at Truman Medical Center for laparoscopic repair of the hernia (Tr. at 246-247).

On November 5, 2008, plaintiff saw Dr. Happel for a follow up on his hernia surgery (Tr. at 275). "[H]e has had no difficulty, has noticed no pain in his groin area. He needed pain medication only for a couple of days." Plaintiff's blood pressure was 136/80. Dr. Happel told plaintiff to come back in one month and in the meantime not to lift anything greater than 20 pounds or do any strenuous activity. "When he returns to our clinic, at that time, we anticipate discharge from the general surgery clinic and released [sic] to full activity."

On November 13, 2008, plaintiff saw Matthew John, M.D., at Truman Medical Center for a follow up on hypertension (Tr. at 270). "He noticed no headache, vision change, chest pain, shortness of air, abdominal pain, nausea, vomiting, diarrhea, lower extremity swelling, or pain. He notes no neurologic deficit. No focal or muscular deficits. The patient has normal reported sensation." Plaintiff's blood pressure was 130/90. Plaintiff was assessed with uncontrolled hypertension and his medication was increased.

On December 16, 2008, plaintiff saw Dr. John for a follow up on hypertension and left hip pain (Tr. at 266). Plaintiff complained that his hip pain was limiting most of his activities. Plaintiff's blood pressure was 152/94. Dr. John noted that plaintiff's gait was abnormal in that he favored his left hip. He had tenderness to palpation over his left hip. Range of motion was limited by pain. Dr. John assessed uncontrolled hypertension and chronic left hip pain. He refilled plaintiff's hypertension medications; prescribed amitriptyline (antidepressant), gabapentin (for nerve pain) and Lidoderm patches (for nerve pain); and referred him to an orthopedic specialist.

Ten months later, on October 29, 2009, plaintiff saw Dr. John complaining of left hip pain, hypertension and "status post head trauma" (Tr. at 250-251). Plaintiff said he had seen someone in orthopedics who said to continue with his current hip care plan. Plaintiff described his hip pain as "disabling" and said he has to lie down for a couple of days in a row

whenever he exerts himself too much or works too hard. Plaintiff had just recently restarted his high blood pressure medication. He also reported having recently been the victim of a car jacking and had a gash across the left side of his forehead. He reported having no fainting, no dizziness, no nausea. "Seems to be doing otherwise well." Plaintiff's blood pressure was 152/110. Plaintiff had normal range of motion but with some pain in his hip. Strength was normal in all extremities. His gait was observed to be normal.

Dr. John assessed chronic left hip pain for which he prescribed gabapentin (for nerve pain), meloxicam (non-steroidal anti-inflammatory), and Ultram (for pain). He assessed a concussion. A CT taking at CenterPointe Hospital had been normal. He was assessed with hypertension and was told to restart hydrochlorothiazide and lisinopril.

Six months later, on April 29, 2010, plaintiff saw Dr. John at Truman Medical Center for routine evaluation of hypertension and left hip pain (Tr. at 248). "Mostly today he needed to be seen for his blood pressure because he has not [been] seen at least in six months. I think it has been almost a year actually since I have seen him last. Today, he notes feeling overall well. He has a lot of stress in his life, and says that all of his problems are exacerbated by his stress." Plaintiff reported having no headache, no vision change, no chest pain, no shortness of air, no nausea, no vomiting, no diarrhea, no constipation, no lower extremity swelling or edema, and review of systems was otherwise negative. Dr. John performed an exam. Plaintiff's blood pressure was 190/116 initially, and Dr. John checked it again himself and it was 150/100. Plaintiff's exam was normal except that he had pain with any movement of his hip. Dr. John assessed hypertension (he increased his Coreg and told him to continue his lisinopril and hydrochlorothiazide), and he assessed left hip osteoarthritis for which he refilled plaintiff's Ultram.

June 30, 2010, is plaintiff's last insured date.

On August 19, 2010, plaintiff completed this application for disability benefits.

On September 23, 2010 -- five months after his last medical appointment -- plaintiff saw Tara Brown, D.O., at Truman Medical Center to establish care and for a follow up of "medical problems" and complaints of headache (Tr. at 241-243). Plaintiff reported having had headaches for the past two weeks which he attributed to stress. "He has a court date due to child support issues and his pension is running out." He also complained of feeling short of breath and he reported recent chest pains. He reported difficulty with focusing with regard to his vision. He reported suffering with gastroesophageal reflux disease and said that Prilosec, which had been recommended by Dr. Boyd, was too expensive. Plaintiff had not been taking his antidepressant, and he needed a refill of his high cholesterol medicine. Plaintiff continued to smoke a pack and a half of cigarettes per day and he reported occasional alcohol consumption. Plaintiff's blood pressure was 125/70. His physical exam was normal. Dr. Brown noted that plaintiff was using a cane. Plaintiff was observed to be alert and oriented, his speech and cognition were described as clear, coherent and oriented. He was cooperative with appropriate mood and affect.

Dr. Brown assessed the following:

1. Reports of shortness of air and atypical chest pain, with risk factors for heart disease which include smoking, high cholesterol, and hypertension. She recommended a cardiac stress test.

2. Hypertension, controlled. Plaintiff was taking his medication as prescribed with no adverse reactions.

3. Chronic hip pain. Plaintiff had not been taking the gabapentin. Dr. Brown refilled his prescriptions for Ultram and Flexeril.

4.    Depression.  Defendant had not been taking his antidepressant "for quite some time."  She restarted his prescription.

5.    GERD.  Because over-the-counter Prilosec was too expensive, Dr. Brown prescribed ranitidine which was on the $4 drug list.

6.    Hyperlipidemia.  Plaintiff "used to take" provastatin and was in need of a refill. Dr. Brown ordered blood work and told plaintiff to resume provastatin.

7.    Headaches.  Likely due to stress, no treatment provided.  "I will continue to monitor."

On November 29, 2010, Martin Isenberg, Ph.D., a non-examining agency psychologist, reviewed plaintiff's file (Tr. at 283-293).  Dr. Isenberg found that plaintiff's mental impairment was not severe.  His mental impairment was identified as depression/stress and was found to cause mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation.  In support of his findings Dr. Isenberg noted that plaintiff had no formal psychiatric treatment; his activities of daily living were not significantly limited by psychiatric factors; he is able to do laundry, mow as able, can pay attention for lengthy periods of time, shops, can manage money, drives, reads, etc.

Plaintiff's application for disability benefits was denied on December 2, 2010.

On January 14, 2011, plaintiff saw Michael Brown, D.O., and complained of depression (Tr. at 295-298).  Plaintiff said that Dr. Tara Brown had prescribed Celexa in September and it worked well for two months.  Over the last two months he felt a significant decrease in his mood "due to impending legal problems, which he has.  The patient states that he has been requested to report to prison on January 24 for lack of child support paying it. The patient reports anxiety, depression, and stress surrounding this event which is not

controlled by the Celexa dosage he is currently on." Plaintiff also reported chronic hip pain. "The patient has been treated in the past by a physician in our clinic using tramadol. Patient reports he is having problem with tramadol due to the fact that he has not been able to get the certain amount prescribed to him because the pharmacy was refusing to refill the prescription." Plaintiff continued to smoke. "The patient was previously employed with Lakewood Ammunition, and has been on disability."

Plaintiff's blood pressure was initially 178/90, and was retaken by Dr. Brown and found to be 165/90. Dr. Brown observed that plaintiff was well-developed, well-nourished, in no acute distress. He was alert and oriented times three. His mood and affect were observed to be appropriate and pleasant, "although at times while discussing his legal problems, he appeared to be distressed." His physical exam was normal. Under musculoskeletal exam, Dr. Brown wrote, "The patient had normal range of motion in all extremities, although was using a cane to assist himself while walking into the clinic today." The blood work done in September 2010 was reviewed -- plaintiff had high cholesterol, high triglycerides, high LDL and high blood sugar. He was assessed with depression. "At this time it was felt that the patient's depression is exacerbated namely by his situational fact that he is facing."

Dr. Brown increased plaintiff's antidepressant dosage but explained to plaintiff that his depression was situational. Dr. Brown did not make any changes to plaintiff's hip pain treatment except to permit plaintiff to take over-the-counter Tylenol when needed. Plaintiff was told to go to the financial assistance office that day to get the Truman Medical Center discount on a CPAP. "It is possible this is playing some degree in his exacerbation of his hypertension."

Four months later, on May 25, 2011, plaintiff saw Dr. Tara Brown for a follow up on hypertension, shortness of breath, and worsening GERD (Tr. at 325-327). Plaintiff had not

been able to afford a stress test. "He tells me that life is pretty stressful right now because he has been having to make a lot of court dates regarding child support bills." Plaintiff continued to smoke a pack and a half of cigarettes per day. He said his shortness of breath is worse when he exerts himself. Plaintiff asked that his Ultram dosage be increased for his hip pain. He reported taking over-the-counter Excedrine.

Plaintiff reported taking his antidepressant as directed, "and says that he has noticed a difference with increase and likes it very much. . . . The patient continues to have headaches and he continues to think they are related to his anxiety because of his financial situation and now all the issues surrounding his child support and court dates." Plaintiff's blood pressure was taken at the beginning and end of the appointment and measured 157/97 and 134/86. He was described as well-developed, well-nourished, in no acute distress. He was noted to ambulate with the use of a cane. He was alert and oriented times tree, his mood and affect were appropriate and pleasant. His physical exam was normal. Dr. Brown ordered a chest x-ray and EKG and recommended that plaintiff have pulmonary function tests and a cardiac stress test. Plaintiff was told to start taking his high cholesterol medication again. Plaintiff was told that taking Excedrine was not good management for a long-term headache prevention and control.

On July 14, 2011, plaintiff saw Dr. Tara Brown for a follow up on hypertension (Tr. at 317-324). Plaintiff reported that his shortness of breath was not as bad as on his last appointment. Plaintiff showed some interest in smoking cessation but continued to smoke. He had been taking his GERD medication as needed instead of daily. Plaintiff reported that he continued to get good benefit from his antidepressant.

His blood pressure was 122/80. He was observed to be alert and oriented, in no acute distress, with appropriate mood and affect. His physical exam was normal. His hypertension

was noted to be well controlled. He was scheduled to have pulmonary function tests later that day and he planned to see cardiology in th near future. He was told to take his GERD medication twice a day. Plaintiff's had blood drawn for lab tests.

On July 18, 2011, plaintiff saw Darcy Conaway, M.D., a cardiologist, for complaints of chest pain (Tr. at 314-316). Plaintiff reported that his chest pain started about six months ago, or approximately January 2011. "Mr. Pennington is fairly sedentary. He does ambulate with a cane. He has really no other complaints on his 12-system review at this time." Plaintiff continued to smoke. Plaintiff's physical exam was normal. His blood work was reviewed and it was noted that his liver function tests were more tan two times the upper limits of normal. Pulmonary function tests from July 14, 2011, revealed moderate obstructive airway disease. Dr. Conaway recommended an echocardiogram, adjusted his hypertension medication, and told him to stop smoking. She also recommended blood work to check for hepatitis.

On September 6, 2011, plaintiff saw Dr. Tara Brown to discuss tests and get refills of medications (Tr. at 307-313). "He reports increased stress because he is facing court this week and possibly a jail sentence, but he is unsure." Plaintiff was using a cane and said he was unable to put much weight on his leg although he had not seen an orthopedic doctor in some time. Plaintiff reported "no anxiety, no depression". He continued to smoke. His blood pressure was 120/80. He was alert and oriented with appropriate mood and affect. Plaintiff's GERD was controlled on ranitidine twice a day. He was told to start taking fish oil for his high cholesterol. His hypertension was noted to be well controlled. He continued to have shortness of breath and was told to stop smoking. Dr. Brown continued plaintiff on Tramadol for his hip pain and told him to follow up with orthopedics.

C.    *SUMMARY OF TESTIMONY*

During the January 10, 2012, hearing, plaintiff, medical expert Dr. Steven B. Gerber, and vocational expert Kelly Winn-Boaitey testified.

1.    **Plaintiff's testimony.**

Plaintiff was 52 years of age at the time of the hearing (Tr. at 32). He has a 12th grade education (Tr. at 32). Plaintiff last worked in March 2005 as a Class 14 tool setter at the Lake City Army Ammunitions Plant (Tr. at 32). Plaintiff stopped working there because he began having pain in his right shoulder (Tr. at 33). Plaintiff filed a worker's compensation claim and received a settlement for that shoulder pain (Tr. at 35). He received $12,000 of an $18,000 settlement with the remainder going to his attorney (Tr. at 36). Prior to that plaintiff was a part glazier for a stained glass studio for about 17 years (Tr. at 33). Plaintiff was a sales clerk at a hardware store from 1998 to 2000 (Tr. at 34). He worked in the yard loading culverts, barbed wire, cement, and other things used in construction and on the farm (Tr. at 34).

Plaintiff injured his left hip in a car accident (Tr. at 34). He fell asleep behind the wheel and crossed the center line into oncoming traffic (Tr. at 34). The car rolled four or five times (Tr. at 35). He was convicted of involuntary vehicular manslaughter and served 120 days of shock incarceration (Tr. at 35). Plaintiff had two surgeries on his hip including a replacement (Tr. at 35). Because of his hip problems, plaintiff has difficulty walking, standing, sitting, and rising from a sitting position (Tr. at 36). Without a cane he can walk a half mile; with the cane he can walk two or three miles (Tr. at 36). Without the cane he can stand for 30 to 45 minutes (Tr. at 36). Plaintiff can sit for 30 to 45 minutes at a time, but the type of chair he uses affects the length of time he can sit comfortably (Tr. at 37). Plaintiff limits his lifting to 15 or 20 pounds because of his hip pain (Tr. at 37).

Plaintiff has good and bad days with his hip pain (Tr. at 37-38). He has more bad days a month than good (Tr. at 38). Long car rides exacerbate his hip pain (Tr. at 38). He takes Tramadol for his pain and although it helps, it does not completely get rid of the pain (Tr. at 38).

Plaintiff has a driver's license and is able to drive short distances (Tr. at 39). Plaintiff has a friend who takes care of him (Tr. at 39). He is able to cook simple things like hamburgers (Tr. at 39). He does not do any household chores (Tr. at 39). His girl friend does his laundry (plaintiff stated in his Function Report that he does laundry) (Tr. at 39). He pays someone to do his yard work (Tr. at 39).

Plaintiff is able to raise his right arm to shoulder level, but any higher causes pain (Tr. at 40). He has bad headaches two to three times a month (Tr. at 40). Because of his hypertension, his doctors do not like the medication he takes (he described it as acetaminophen, aspirin and caffeine, which are the active ingredients in over-the-counter Excedrine) because of the caffeine, but he told them it is the only over-the-counter medication that works on his headaches (Tr. at 41).

Plaintiff has "extreme" problems with gastroesophageal reflux disease, despite taking several medications for it (Tr. at 41). His medications cause nausea, GERD, lightheadedness and dizziness (Tr. at 42). Plaintiff is not seeing a psychiatrist or psychologist because he cannot afford to, but he is on medication for depression (Tr. at 42). Plaintiff continues to spend a lot of time in his bedroom and he doesn't talk (Tr. at 42). He is now on a medication that helps with crying spells he used to have (Tr. at 42-43).

Plaintiff said that he was still behind in his child support payments but that he had not been incarcerated over it (Tr. at 43). "I had proof that I had paid this. I had bank statements from Congress Bank showing that I'd paid $60,000 worth of -- but the judge would not look at

it." (Tr. at 43). He has been threatened with imprisonment which is causing him considerable stress (Tr. at 44). I note that plaintiff claimed to be $60,000 behind in child support when he completed a financial affidavit in support of his motion to file this case in forma pauperis (see document number 1).

Plaintiff occasionally goes to church services which are two hours long (Tr. at 45). He is able to understand what is going on (Tr. at 46). He talks to friends and family before, during and after the services (Tr. at 46). Plaintiff gets along well with his parents (Tr. at 46). He is a "big reader" and prefers science fiction books but mostly reads automotive and technical articles about automobiles (Tr. at 46-47). He enjoys reading about cars and performance engines (Tr. at 47). He watches television, but he has "a lot going on right now" so it's hard for him to stay focused on anything for any period of time (Tr. at 47).

Plaintiff supports himself through money he earns doing odd jobs around the house for his parents (Tr. at 48). He gardens, he helps his dad who is an invalid with a bad knee, he helps his mother who had back surgery (Tr. at 48).

Plaintiff was just diagnosed with chronic obstructive pulmonary disease which has "made things worse" (Tr. at 49). He had been smoking for the past 20 years and continued to smoke at the time of the hearing (Tr. at 49).

## 2. Medical expert testimony.

Medical expert Dr. Steven Gerber testified at the request of the ALJ. The record documents hypertension, degenerative joint disease of the right shoulder status post surgery, degenerative joint disease of the left hip status post hip replacement, and mild sleep apnea (Tr. at 29-30). None of these impairments meet or equal a listed impairment (Tr. at 30).

Plaintiff's medical condition according to his records show a functional ability consistent with light exertional level work with limitations of all posturals on an occasional

23

basis, and overhead reaching using the right arm limited to occasional (Tr. at 30). Light work includes lifting/carrying 20 pounds occasionally and 10 pounds frequently (Tr. at 30). The record does not support a limitation on sitting, standing, or walking (Tr. at 30).

3.    **Vocational expert testimony.**

Vocational expert Kelly Winn-Boaitey testified at the request of the Administrative Law Judge. Plaintiff's past relevant work consists of tool setter, DOT 694.360-010, medium (performed at heavy), skilled, SVP of 6; retail sales clerk, DOT 290.477-014, light, semi-skilled, SVP of 3; and window installer, DOT 779.380-010, medium (performed at light to very heavy), skilled, SVP of 7 (Tr. at 50-51).

The first hypothetical[7] involved a person who could lift 20 pounds occasionally and 10 pounds frequently; should do no work above shoulder level with the right upper extremity; could occasionally climb stairs, balance, stoop, kneel, crouch and crawl; and should never climb ladders, scaffolds or ropes (Tr. at 51). Such a person could perform plaintiff's past relevant work as a retail sales clerk (Tr. at 51).

If a person missed two or more days of work per month, the person would not be employable (Tr. at 51). If a person needed breaks away from the work station beyond the normal scheduled ones, that person would not be employable (Tr. at 52).

V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Keith Dietterle entered his opinion on February 8, 2012 (Tr. at 12-22). Plaintiff's last insured date was June 30, 2010 (Tr. at 12, 14).

---

[7]There was actually a second hypothetical posed; however, it was no different from the first. In the second, the ALJ asked the vocational expert to assume a person whose limitations were the same as the first except the person could do no work above shoulder level with the right arm (Tr. at 51). Yet the first hypothetical also restricted the person to doing no work above shoulder level with the right arm. In any event, the vocational expert testified that such a person could work as a retail sales clerk (Tr. at 51).

Step one. Plaintiff did not engage in substantial gainful activity from his alleged onset date through his last insured date (Tr. at 14). Although plaintiff had earned income in 2005, 2006, and 2007, those earnings did not amount to substantial gainful activity (Tr. at 14-15).

Step two. Plaintiff suffers from the follow severe impairments: left inguinal hernia, hypertension, sleep apnea, degenerative joint disease of the left hip, and degenerative joint disease of the right shoulder status post rotator cuff repair (Tr. at 15). "Regarding the claimant's mental health, the record shows that during the relevant time period, the claimant lacked a severe medically determinable mental impairment or combination of impairments. This finding is supported by the medical evidence of record." (Tr. at 16).

Step three. Plaintiff's impairments did not meet or equal a listed impairment (Tr. at 17).

Step four. Plaintiff retained the residual functional capacity to perform light work but could not perform any work involving activity above shoulder level with the right arm (Tr. at 19). Plaintiff's testimony about the intensity, persistence and limiting effects of his symptoms is not credible to the extent it is inconsistent with the residual functional capacity (Tr. at 19). The ALJ did not consider any limitation involving plaintiff's left hip condition because disability benefits cannot be assigned to any injury or any manifestation from the injury if it occurred during the commission of a felony, and here plaintiff's hip injury stemmed from his conduct which resulted in a felony manslaughter conviction (Tr. at 20).

Through the date last insured plaintiff was capable of performing his past relevant work as a retail sales clerk both as it was performed and as generally performed (Tr. at 21).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. First plaintiff argues that the ALJ improperly relied on a notation in Dr. Brown's record six months after plaintiff's last insured date, which stated that plaintiff was well developed, well

nourished, and in no acute distress with normal range of motion in his extremities. Second plaintiff argues that the ALJ "did not consider even most of the credibility factors" enumerated in Polaski.

Plaintiff does not state what part of his testimony was erroneously discounted by the ALJ. Further, plaintiff did not elaborate or even identify which Polaski factors were relevant but not discussed by the ALJ.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.

1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the

Polaski opinion, and additionally states that the following factors should be considered:

Treatment, other than medication, the individual receives or has received for relief of pain or

other symptoms; and any measures other than treatment the individual uses or has used to

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20

minutes every hour, or sleeping on a board).

Plaintiff's first argument regarding the ALJ's alleged improper reliance on Dr. Brown's

medical record dated six months after plaintiff's last insured date includes the following:

> The ALJ found Plaintiff not credible [beyond] the extent of the RFC because of one notation made by Dr. Brown six months after his date last insured. The ALJ pointed out Dr. Brown had noted Plaintiff to be well developed, well nourished, and in no acute distress with normal range of motion in his extremities. Dr. Brown also noted, however, Plaintiff required the use of a cane to assist with walking, and appeared to be distressed when discussing his legal problems arising from his motor vehicle accident. Plaintiff went to see Dr. Brown not for his physical problem, but for his depression. Dr. Brown did diagnose depression and started Plaintiff on an antidepressant. Further, Dr. Brown diagnosed and treated hypertension, chronic hip pain, GERD, obstructive sleep apnea, and hyperlipidemia. This single notation from 6 months after Plaintiff's date last insured and 6 years after his onset date of disability does not diminish Plaintiff's credibility.

(plaintiff's brief at pages 18-19).

In addition to failing to indicate what part of plaintiff's testimony is improperly

contradicted, I note inaccuracies in plaintiff's argument. Dr. Brown did not note that plaintiff

"required" the use of a cane, Dr. Brown noted that plaintiff used a cane. However, there is no

medical record showing that any doctor prescribed, or even recommended, that plaintiff use a

cane. In fact, the record contains repeated recommendations that plaintiff exercise, not that he

use a cane. On January 6, 2006, Dr. Walker observed that plaintiff's gait was normal. On

September 25, 2008, Dr. McGaha observed that plaintiff's gait was normal. On December 16,

2008, Dr. John observed that plaintiff's gait was abnormal in that he favored his left hip. He

referred plaintiff to an orthopedic specialist; however, there is no evidence that plaintiff saw an

orthopedic specialist at that time.  In fact, his next medical record is dated ten months later when he went to see Dr. John again about hip pain and Dr. John observed at that time (October 29, 2009) that plaintiff's gait was normal.  Plaintiff first showed up at a doctor's office with a cane on September 23, 2010 -- one month after he applied for disability benefits.  This is the medical report discussed in this argument.  Dr. Tara Brown observed that plaintiff was using a cane; however, plaintiff's physical exam on this day was normal.

Plaintiff argues that he went to see Dr. Brown not for a physical problem but for depression.  However, the record states that plaintiff went to see Dr. Brown to establish care and for a follow up of "medical problems" and complaints of a headache.  "[Plaintiff] presents to the family medicine clinic today for f/u of HTN [hypertension], hip pain, depression, GERD, hyperlipidemia, and a new complaint today of HA [headache] and also some SOA [shortness of air]."  Although Dr. Brown did assess depression, she noted that plaintiff had not been taking his antidepressant "in quite some time."  She gave him a new prescription for the same medication he had been prescribed some time ago but had stopped taking (and noted that it was on the $4 drug list).  She also observed that plaintiff was alert and oriented; his speech and cognition were clear, coherent and oriented; he was cooperative; and his mood and affect were appropriate.  The majority of her record was indeed focused on physical problems, not depression.  She assessed reports of shortness of air and atypical chest pain but noted that plaintiff continued to smoke and had further cardiac risk factors of high cholesterol and hypertension.  She assessed hypertension -- controlled as he was finally taking his medication as prescribed and with no adverse side effects.  She assessed chronic hip pain but noted that plaintiff had not been taking his gabapentin which had been prescribed for his hip pain.  She assessed GERD but noted that plaintiff had not been taking the over-the-counter Prilosec as recommended allegedly due to cost, but yet he continued to find the money to buy cigarettes.

She assessed hyperlipidemia and noted that plaintiff was no longer taking the provastatin that had been prescribed for high cholesterol. Finally, she assessed headaches but provided no treatment and instead indicated that she would simply monitor that condition.

Plaintiff argues that Dr. Brown noted that plaintiff appeared to be distressed when discussing his legal problems arising from his motor vehicle accident; however, plaintiff was noted to be distressed due to an upcoming court date due to child support issues and the fact that his "pension is running out." He was also noted to be tearful that day because he said his sister had breast cancer and was very ill.

The Polaski factors support a finding that plaintiff has no greater limitations than those found by the ALJ.

Work Record. Although plaintiff has a good work record for the most part, the record establishes that his job of 17 years ended when the company went bankrupt, and his job as a tool setter ended when his employer found out about his felony conviction.

Daily Activities. Plaintiff stated in a Function Report that he is able to do laundry (which was contradicted by his hearing testimony), shop for groceries, read, watch television, and drive. He reported going to Concerts in the Park on a regular basis. He said that his condition does not affect his ability to remember, concentrate, understand, follow directions, or pay attention. On January 6, 2006, plaintiff saw Dr. Walker and said he had recently been riding a mountain bike. At the administrative hearing, plaintiff testified that he was supporting himself with the money he earned doing odd jobs around the house for his parents, gardening, helping his dad who was "an invalid" and helping his mother who had had back surgery.

Duration, Frequency and Intensity of Symptoms. Plaintiff's hypertension, even when not under control, was noted to be asymptomatic. Prior to the time of his hernia repair, it was noted to have not caused any particular pain "in the past or at present."

Plaintiff had long absences from medical care after his alleged onset date which suggests that his symptoms were not as severe as he claims. In June 2007, he had not seen a doctor in 13 months. After that appointment he waited another year to see a doctor. After December 2008, plaintiff waited ten months to return for medical care. After that appointment, six months elapsed. Lest defendant argue that his lack of funds caused his infrequent medical appointment, I point out that on June 5, 2007, after a 13-month period with no medical care, plaintiff saw Dr. Boyd because he had been out of his blood pressure medicine. He was noted to be asymptomatic, and his exam was normal in all respects. He had no other medical complaints. On June 10, 2008, after a year with no medical care, plaintiff saw Dr. Boyd for a follow up and a refill on his medications, and his physical exam was normal. No treatment was provided other than refills. On October 29, 2009, after ten months with no medical care, plaintiff saw Dr. John because he had been the victim of a car jacking and had a gash across the left side of his forehead. "Seems to be doing otherwise well." On April 29, 2010, after a six-month period with no medical care, plaintiff was seen for "routine evaluation" of hypertension and left hip pain. "Today, he notes feeling overall well." Plaintiff's physical exam was normal other than pain in his hip. The medical records establish that plaintiff did not seek frequent medical care because it was not needed. In addition, during this entire time, plaintiff had the ability to finance his daily smoking habit. It was not until his "pension" was running out that plaintiff applied for disability benefits and then sought medical care on a regular basis. However, by then, his last insured date had passed.

Precipitating and Aggravating Factors. On September 5, 2008, Dr. McGaha told plaintiff that his failure to use a CPAP machine for his sleep apnea "may be the source for many of his underlying problems including his hypertension, depression, restless legs, [and] daytime somnolence problems." Dr. Michael Brown told plaintiff the same thing on January

11, 2011 -- two years and four months later.  At no time during the time between plaintiff's alleged onset date and his last insured date did he ever use a CPAP as recommended.

Dr. Michael Brown believed that plaintiff's depression was exacerbated by his belief that he had to report to prison in ten days.  His depression was noted on multiple occasions to be situational -- mostly a result of his pending legal troubles and the prospect of going to jail but also due to his pension benefits (apparently related to his worker's compensation case) running out.  Clearly his hypertension, shortness of air, and chest pains were exacerbated by his continued smoking; however, even those conditions were noted to cause no functional limitations.

Dosage, Effectiveness, and Side Effects of Medication.  The record establishes that when plaintiff took his medication as prescribed, his conditions were noted to be under control.  In April 2006, Dr. Boyd noted that plaintiff had stopped taking his antidepressant but that it had not appeared to cause a problem.  On June 5, 2007, plaintiff had been out of his blood pressure medicine and his blood pressure was very high at 205/130; however, he was noted to be asymptomatic.  When plaintiff finally started taking his antidepressant regularly, he noted that he saw a difference and "likes it very much."  Later he continued to report that he was getting good benefit from his antidepressant.  Two months after that plaintiff continued to report "no anxiety, no depression."  When plaintiff took his ranitidine twice a day as directed, his GERD symptoms were completely resolved.

Although plaintiff testified at the hearing that his medications caused nausea, GERD, lightheadedness and dizziness, the medical records reflect that he never reported any of these symptoms other than GERD and then only when he failed to use his medication as recommended.  Further his GERD symptoms were only treated with prescription medication because it was cheaper than over-the-counter antacid medication.  Plaintiff specifically

reported no side effects from medication when he saw Dr. Tara Brown and at that time he was taking Celexa, Flexeril, Pravachol, Ultram, Carvedilol, Gabapentin, Hydrochlorothiazide, Lisinopril, and Ranitidine. Therefore, it is unclear what medication plaintiff believed, at the time of his hearing testimony, was causing him adverse side effects.

Functional Restrictions. The only functional limitations dealing with his shoulder occurred from March 17, 2005 (the date of his surgery) until August 15, 2005, when he was released to return to work with no restrictions beyond that found by the ALJ. This covers a period of only five months. Plaintiff's orthopedic surgeon stated less than six months after the surgery that she would not want him performing a position where he has to use his right arm above shoulder level continuously. This is consistent with the RFC as assessed by the ALJ. Dr. Walker recommended in January 2006 that plaintiff not do work above shoulder level with the right arm and not lift more than 20 pounds with his right arm which again is consistent with the RFC assessed by the ALJ.

Regarding his overall physical condition, the record contains multiple recommenda-tions that plaintiff exercise, not that he limit any activity. In fact, during the period between his alleged onset date and his last insured date, plaintiff consistently had essentially normal exams. On June 5, 2007, Dr. Boyd's exam was normal in all respects. On June 10, 2008, Dr. Boyd's exam was normal. On July 16 2008, Dr. Dahl's exam was normal except tenderness over the lumbar spine after plaintiff fell off a boat. On October 29, 2009, Dr. John's exam was normal except that plaintiff had some pain in his hip. On April 29, 2010, Dr. John's exam was normally except that plaintiff had some pain in his hip. Even after his last insured date, plaintiff's exams continued to be essentially normal. On September 23, 2010, Dr. Tara Brown's exam (physical and mental) was normal. On January 14, 2011, Dr. Michael Brown's physical exam was normal and his mental exam was normal except that plaintiff appeared to

be distressed when talking about his legal problems. On May 11, 2011, Dr. Tara Brown's exam (physical and mental) was normal. On July 14, 2011, Dr. Tara Brown's exam (physical and mental) was normal. On July 18, 2011, Dr. Conaway's exam was normal.

Aside from all of the above, I point out that plaintiff's hearing testimony is essentially consistent with the ALJ's finding. Plaintiff testified that he has problems walking, standing, sitting and rising from a seated position, but he said all of those limitations were caused by his hip problems. 20 C.F.R. § 404.1506(a) provides as follows: "In determining whether you are under a disability, we will not consider any physical or mental impairment, or any increase in severity (aggravation) of a preexisting impairment, which arises in connection with your commission of a felony after October 19, 1980, if you are subsequently convicted of this crime." Therefore, the ALJ properly discounted any limitation caused by plaintiff's hip in assessing plaintiff's residual functional capacity. Plaintiff testified that he limits his lifting to 15 or 20 pounds, which is (1) consistent with the ALJ's residual functional capacity assessment, and (2) caused by plaintiff's hip, according to his testimony. Plaintiff testified that he is able to raise his arm to shoulder level but any higher causes him pain. Again, this is consistent with the ALJ's residual functional capacity assessment. Plaintiff testified that his doctor does not like him to take Excedrine for his headaches, but he did not testify as to any functional restriction caused by headaches, and the medical records establish that plaintiff first complained of headaches three months after his last insured date, and prior to that had specifically denied headaches on November 13, 2008, and on April 29, 2010. There is no further mention of headaches in the medical records. There is no other hearing testimony that is inconsistent with the ALJ's residual functional capacity assessment.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's testimony is not credible to the extent it alleges limitations more severe than those found in the ALJ's residual functional capacity assessment.

## VII.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in failing properly to assess plaintiff's residual functional capacity in that the ALJ found that plaintiff suffered from mild restriction of activities of daily living; mild difficulties maintaining social functioning; and mild difficulties maintaining concentration, persistence or pace, but the ALJ did not include corresponding limitations in the residual functional capacity. Plaintiff argues that even though the ALJ found that plaintiff's mental limitation was not a severe impairment, he was required to include some mental limitation in the residual functional capacity.

Plaintiff does not identify what mental capability he cannot perform that the ALJ found he could perform. Again, I note that (1) plaintiff's testimony during the hearing is not inconsistent with the ALJ's residual functional capacity assessment, and (2) when plaintiff finally took his antidepressant as instructed he consistently reported no anxiety, no depression, and no other mental symptoms. His Function Report and his hearing testimony established that he is an avid reader of technical material; his condition does not affect his ability to remember, to concentrate, to understand, or to follow instructions; and he is able to pay attention for several hours. Further, although plaintiff argues that the ALJ should have assessed limitations based on plaintiff's sleep apnea, the record establishes that plaintiff never complied with his doctor's recommendation to use a CPAP which was the only treatment ever recommended for his sleep apnea. 20 C.F.R. 404.1530 provides in part as follows:

> (b)    When you do not follow prescribed treatment. If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits.

(c)     Acceptable reasons for failure to follow prescribed treatment. We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have an acceptable reason for failure to follow prescribed treatment. The following are examples of a good reason for not following treatment:

(1)     The specific medical treatment is contrary to the established teaching and tenets of your religion.

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.

(4)     The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or a major part of an extremity.

Plaintiff offered no good reason for failing to get a CPAP.  Although he on occasion claimed he did not get one due to cost, he continued to smoke and even after Truman Medical Center physicians mentioned the CPAP could be obtained through the Truman discount, there is no evidence that plaintiff ever got one.

Plaintiff further argues that the residual functional capacity assessment is erroneous because the ALJ relied heavily on the testimony of Dr. Gerber who did not hear plaintiff's testimony, did not talk about plaintiff's inguinal hernia (which the ALJ found to be a severe impairment but did not find any corresponding functional limitations), and whose opinion did not mirror the findings of the ALJ with regard to all of plaintiff's limitations.  This argument is without merit.  Dr. Gerber's testimony was that plaintiff's restrictions are less severe than those found by the ALJ.  The medical record states that plaintiff's hernia was causing no pain during the three years before it was surgically repaired.  Despite plaintiff's argument that the ALJ should have limited plaintiff's stooping, bending, twisting, crouching, and crawling because

those activities "would be" affected by a hernia, the record establishes that plaintiff never complained of any symptoms or limitations whatsoever related to his hernia. The ALJ's residual functional capacity assessment need not be based on the opinion of any one particular doctor, rather he is charged with determining the most that a plaintiff can do considering all of the credible evidence in the record. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011).

Based on the above, I find that the substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

## VIII.    PAST RELEVANT WORK

Plaintiff argues that the ALJ erred in finding that plaintiff had past relevant work as a retail sales clerk because there were no "sales" involved in his position as performed. This argument is without merit. Plaintiff testified that he worked as a sales clerk. The vocational expert testified that a hypothetical person with the residual functional capacity as assessed by the ALJ could perform the duties of a sales clerk position as defined by the Dictionary of Occupational Titles and as described by plaintiff. Since plaintiff could perform the actual functional demands of this past relevant job, it did not matter whether his job description perfectly aligned with the DOT definition. Moad v. Massanari, 260 F.3d 887, 891 (8th Cir. 2001); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996) (citing SSR 82-61).

## IX.    HYPOTHETICAL

Plaintiff argues that the ALJ erred in failing to consider plaintiff's learning difficulties in finding that he could perform the job of retail sales clerk, and that plaintiff's learning difficulties should have been included in the hypothetical to the vocational expert. He points to a document prepared by Jewish Vocational Service on July 10, 2008 (Tr. at 235-240). This document states that plaintiff was terminated from his job as a tool setter at the ammunitions plant "when a background check was done and his felony for manslaughter in an auto

accident was revealed." Plaintiff reported as his strengths strong learning ability with practice, detail oriented, and good literacy skills. His adult basic learning examination showed that his vocabulary was in the 99th percentile, his reading comprehension was in the 98th percentile, total language was in the 50th percentile, total math was in the 21st percentile. As far as learning style, the report states as follows:

> Mike had uneven results on his testing. He appears to have some difficulty with speed constraints of testing possibly due to the lack of exposure to computer usage. He has retained his literacy skills at an average to above average level as measured by the Adult Basic Learning Examination. Math score fell in the low average range indicating a need for review and exposure to higher level study. He has the ability to read and understand technical information and would appear to have sufficient effective learning ability to grasp a vocational training program.

Finally, the report includes the following: "Mike appears to still be at the reasoning stage where zero income is more acceptable than beginning pay." This followed a discussion about plaintiff having earned $18 per hour at his last job that ended when his manslaughter conviction was discovered.

Plaintiff's past relevant work includes skilled and semi-skilled work. There is no evidence that anything occurred which would change his ability to perform this level work. Plaintiff's argument on this basis is wholly without merit.

## X.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 2, 2014